Kristen Marie LEE, an infant by her father and natural guardian, Edward Lee, and Edward Lee, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 78 C 2021.

United States District Court, E. D. New York.

Feb. 22, 1980.

**884**

Kramer, Dillof, Tessel, Duffy & Moore, New York City (Charles Kramer, Daniel Kramer, New York City, of counsel), for plaintiff.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y. (J. Christopher Jensen, Richard H. Dolan, Brooklyn, N. Y., of counsel), for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), alleging personal injuries to plaintiff Kristen Marie Lee resulting from malpractice by federal government doctors. The government moves to dismiss the complaint pursuant to Rule 12(h) of the Federal Rules of Civil Procedure, asserting that the court lacks subject matter jurisdiction since plaintiffs failed to present their claim to the appropriate federal agency within two years after it accrued as required by 28 U.S.C. § 2401(b). Since the parties have submitted materials in addition to the pleadings the court treats the motion as one for summary judgment pursuant to Rule 56.

Kristen is a brain-damaged, retarded six-year old girl, and the complaint alleges that her condition is the result of malpractice committed by Air Force doctors at the Carswell Air Force Base Hospital (the "Base Hospital") in her delivery and immediate post-birth care.

From the depositions and other papers the following pertinent facts appear. At the time of the birth in November 1973, Kristen's father, plaintiff Edward Lee, was an Air Force sergeant and Physical Therapist Specialist stationed at the base. Although his wife was obese and hypertense she had an uneventful pregnancy, and after her membranes ruptured she was admitted to the Base Hospital on November 6th, 1973. When she did not spontaneously go into labor the doctors administered the drug pitocin in gradually increasing doses for approximately twenty-four hours. They then proceeded to deliver the child by caesarean section. A spinal anesthetic was administered. The baby's head had to be removed with forceps.

The baby was suctioned to clear her breathing passage and stomach, and she was administered free flowing oxygen. However, at five minutes after the birth there was an indication that she had a degree of depression. In a few minutes she was brought to the nursery, and in response to her poor condition the chief of pediatrics ordered diagnostic tests which revealed that she was suffering from aspiration pneumonia, with possibility of hyaline membrane disease.

That afternoon after the birth she was observed to be in respiratory distress and poorly responsive. Despite the attending doctor's further measures at one point she began spitting up and choking, her color turned blue, and she had no visible respiration. The chief of pediatrics then inserted an endotracheal tube, and oxygen under positive pressure was administered. Her respiration was thereafter re-established.

Lee saw his daughter after she arrived at the nursery. The chief of pediatrics informed him that she was having difficulty breathing because she had fluid in her lungs.

That same day she was transferred to John Peter Smith Hospital ("Smith Hospital"), which had specialized facilities for treating new-born infants. She continued to have difficulties through the night. During a conversation with a staff physician that evening at Smith Hospital, Lee had the first indication that Kristen might be suffering from brain damage. During

the next two days her prognosis remained guarded. During that time the attending physician explained to Lee that she "had decreased levels of oxygen to the brain at a crucial time around the perinatal time." By November 13, 1973 it became clear that she was going to survive, and a week later she was discharged.

During her stay at Smith Hospital the physician explained to the parents that their daughter had had difficulties breathing and had had seizures. He also explained that she had had trouble obtaining oxygen because she had fluid in her lungs. When Lee asked why there was fluid in the lungs the doctor replied that he did not know.

After discharge from Smith Hospital the child saw the Smith Hospital doctor three times, the last being in December 1974 when she was 13 months old. The doctor testified that he told the parents that Kristen would probably be severely handicapped. Lee testified that the doctor told him that "because of the aspiration syndrome and because of the delivery and the possibility of lack of oxygen" her prognosis was guarded and her neurological progress was slow.

According to Lee at no time did any doctor at the base Hospital or at Smith Hospital state or even insinuate that the manner of the delivery had anything to do with Kristen's condition.

The Lees moved to New York in December 1974. On May 6, 1975 a doctor at North Shore University Hospital saw Kristen and after reviewing some of the medical records told the parents that Kristen's problem was not genetic or hereditary or caused by anything they had done but was due to an "insult at the time of birth." Thereafter Kristen was seen by various doctors at the Cerebral Palsy Center in Roosevelt, New York, and in January 1977 one of them told the parents that the cause of the brain damage was the mismanagement of the delivery.

Following this discussion the parents consulted counsel, and on May 4, 1977, the written claim was presented to the Air Force. On August 10, 1978, the Air Force denied the claim on the grounds that it was untimely filed and therefore barred by 28 U.S.C. § 2401(b). This action was commenced on September 11, 1978.

Plaintiffs claim that the doctors at the Base Hospital were guilty of malpractice in several respects which caused the injury. In particular plaintiffs say that the doctors departed from accepted medical practice (a) in administering the drug pitocin over a lengthy period to induce labor without first checking whether Mrs. Lee had a cephalopelvic disproportion, (b) in giving to a hypertensive patient a spinal anesthetic which led to a reduced supply of oxygen to the child, and (c) in failing to administer endotracheal intubation immediately after birth.

Section 2401(b) bars a tort claim against the United States "unless it is presented in writing to the appropriate Federal agency within two years after such [a] claim accrues." The issue on the motion is whether the claim accrued before May 4, 1975.

■ Statutes of limitation are enacted on the theory that a defendant ought not to be called upon to defend even against a just claim where "evidence has been lost, memories have faded, and witnesses have disappeared," *Order of R.R. Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944), or where a lapse of time is such as to encourage or facilitate fraudulent claims. The chief purposes in setting the limitation period are, in fairness to defendants, to try to assure them they will not be required to meet a claim at so late a date that their defense is likely to be compromised, and, in fairness to plaintiffs, to afford them a reasonable opportunity to make their claims. The same concerns are relevant to a determination of when the limitation period should begin to run. Rationally to decide upon both the limitation period and the time when the claim "accrues" thus involves the weighing of a variety of factors, including the nature of the claim, the consequent probable degree of permanence of the evidence, and the time when the injured

person is likely to learn of the claim and to be in a position to assert it.

Typically these policy judgments are made by the legislature, and Congress in 28 U.S.C. § 2401(b) unambiguously set the limitation period as two years. But the question of when a claim against the United States "accrues" within the meaning of that section is not addressed in the legislation or in the pertinent legislative reports. S.Rep. No.1400, 79th Cong., 2d Sess. (1946); H.R. Rep.No.276, 81st Cong., 1st Sess. (1949); U.S.Code Cong.Serv.1949, p. 1226; S.Rep. No.1327, 89th Cong., 2d Sess. (1966); H.R. Rep.No.1532, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 2515. In numerous cases, therefore, the courts have been required to decide the issue and in doing so to weigh the pertinent factors.

In the usual personal injury case the action is deemed to accrue when the injury is inflicted. In such situations, for example an automobile accident, the plaintiff is generally aware of his injury and the source from which it stemmed. But in medical malpractice actions the matters to be considered are frequently more complex. The patients may not know that they have been injured or, if they do, they may not know that acts of their doctor have contributed to the injury. The doctor will hardly be inclined to proffer information which may lead to action against him, and, relying on his vastly superior knowledge and experience, the patients may be slow to learn the critical facts.

▮ Plainly then the extent of the patients' knowledge is pertinent to a determination of whether they have had a fair chance to file a timely malpractice claim. And in construing 28 U.S.C. § 2401(b) the courts have so held. The latest example is *United States v. Kubrick*, —— U.S. ——, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). There medical personnel at a Veterans Administration hospital treated Kubrick's infected leg with neomycin, and he suffered a loss of hearing. More than two years after a private physician had informed him that the hearing loss probably resulted from the

treatment with neomycin Kubrick filed a claim. The Court held that the claim was barred, that it accrued when he discovered the "essential facts" of both his injury and its cause, and that the accrual of the claim was not postponed by the fact that he was unaware that the treatment constituted malpractice.

The Court distinguished from Kubrick's case those situations where claimants are ignorant of the fact of injury or its "cause", saying "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." The Court pointed out that the prospect was not so bleak "for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury" because then he is "no longer at the mercy of the latter" and others can tell him, if he asks, whether he has been wronged. *Id.* at ——, 100 S.Ct. at 359.

In the end the Court made the test whether a "reasonably diligent" claimant knows enough so that he "can protect himself by seeking advice in the medical and legal community." *Id.* at ——, 100 S.Ct. at 360. At this point the claim "accrues", and the two years prescribed in section 2401(b) begin to run.

▮ Applying this test and viewing the facts most favorably to plaintiffs in this case, as is proper on this motion, the government has not shown that Lee had sufficient knowledge to cause the claim to accrue prior to May 4, 1975.

Before that date he admittedly knew that lack of oxygen to the brain could cause damage and that Kristen had stopped breathing due to the filling of her lungs with fluid. But the doctors at the Base Hospital did not volunteer that their acts had led to that condition, and he claims that when he asked the doctor at Smith Hospital why Kristen had fluid in her lungs the doctor responded that he did not know. Lee says it was not until May 6, 1975 that he knew that Kristen's condition was due to "an insult at the time of birth" and not until January 1977 that he became aware

that the manner of the delivery caused the fluid to accumulate in the lungs.

The government argues that it is enough that Lee knew that fluid in the lungs was the injury's "cause", as that term was used in the *Kubrick* case. But the concept of causation theoretically embraces everything that has ever occurred commencing with the ultimate cause of causes up until the present instant, *Bloom v. Bradford*, 480 F.Supp. 139, 148 (E.D.N.Y.1979), and the Supreme Court plainly did not mean by the "cause" of the injury to Kubrick to refer to the action of the neomycin on the cells of his body. The Court referred rather to the administration of the drug by the hospital personnel. As the Court indicated, to know the "cause" the plaintiff must know "who has inflicted the injury." —— U.S. at ——, 100 S.Ct. at 359. In an action for medical negligence the "cause" which is at issue is the act of the defendant which gave rise to the injury.

So here in order to bar plaintiffs' claim the government must show not merely that Lee knew within the two years before filing that claim that Kristen had had fluid in her lungs but that he knew or in the exercise of due diligence should reasonably have known that the alleged acts of the hospital doctors brought about that condition. The government has not made that showing. When Lee was told by the doctor at Smith Hospital that he did not know what caused the fluid, Lee could reasonably have believed that the condition was wholly unrelated to anything the doctors did.

It is unnecessary to decide the other issues raised by plaintiffs.

The motion is denied. So ordered.