**Paul MORTENSEN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**79 CIV 5945 (LBS).**

United States District Court, S. D. New York.

Oct. 27, 1980.

Florrie L. Wertheimer, New York City, for plaintiff; Bernard D. Friedman, New York City, of counsel.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, Leslie R. Bennett, Stuart M. Bernstein, Asst. U. S. Attys., for defendant.

McHugh, Heckman, Smith & Leonard, Dennis McMahon, New York City, for McAllister Brothers.

## OPINION

SAND, District Judge.

The question posed by the motion before this Court is whether plaintiff's claim against the United States resulting from alleged medical malpractice by the United States Public Health Service Hospital at Staten Island, New York (the "PHS") during the period from February 12, 1976 to November 25, 1977 is barred by the two year statute of limitations of the Federal Tort Claims Act. 28 U.S.C. § 2401.

We find that plaintiff's claim for this period of time is so barred.

## FACTS

For the purposes of disposition of defendant's motion, we view the facts in the light most favorable to plaintiff.[1]

On September 8, 1975, plaintiff was injured while working for McAllister Brothers, Inc. on the Tug Helen McAllister. As a result of a fall, he sustained injuries to his back and arms. On September 19, 1975, plaintiff was treated at the emergency room of Community Memorial Hospital in Toms River, New Jersey. As an American merchant seaman, plaintiff is required to seek medical care from the Public Health Service. Therefore, plaintiff visited the PHS for additional treatment.

In the period from February 12, 1976 to July 2, 1976 (the "first treatment period"), plaintiff visited several clinics at the PHS. His condition was diagnosed as right ulnar nerve neuropathy by the physician on duty at the general clinic on plaintiff's first visit to the PHS, and subsequently by Dr. Taboada of the neurology clinic. His symptoms included diminished sensation along the ulnar aspect of the right forearm and right hand, weakened right hand grip and atrophy of the hypothenar region of the right hand.

On July 2, 1976, plaintiff was "discharged" from the neurology clinic.[2] Plaintiff alleges that, on July 2, 1976, Dr. Taboada informed him that his condition would improve with time and that nerve injuries sometimes take a long time to heal. After July 2, 1976, plaintiff was not treated or examined again at the PHS until November 25, 1977, when he returned to the PHS and was treated until August 14, 1978 (the "second treatment period").

Between July 2, 1976 and November 25, 1977 (the "interim period"), plaintiff saw several private physicians who were not affiliated with the PHS. After he was injured in a bus accident on December 1,

---

1. A chronological listing of the relevant events is set forth in Appendix A.

2. There is a dispute about the meaning of the term "discharge", and about its implications to the continuous treatment theory, which is discussed, *infra* at 29–30.

1976, plaintiff was treated at Community Memorial Hospital and then by Dr. Ponnambalam, an orthopedist. Dr. Ponnambalam noted plaintiff's ulnar nerve symptoms and referred him to other physicians for testing. Based on the results of the tests, Dr. Ponnambalam, in consultation with the other physicians, concluded that surgery was recommended. On February 16, 1977, Dr. Ponnambalam advised plaintiff that he recommended surgery. Dr. Ponnambalam did not, however, inform plaintiff that his condition may have been caused or exacerbated by negligent treatment at the PHS.[3] The recommended surgery was not performed at this time.

On November 25, 1977, plaintiff began his second treatment period at the PHS. He was seen on an inpatient and outpatient basis at various clinics within the PHS, including the neurology clinic, where he was seen by Dr. Taboada, the physician who had "discharged" him on July 2, 1976. Plaintiff ultimately underwent two surgical procedures, on April 5, 1978 and June 2, 1978, which he alleges were unsuccessful and left him unable to use his right hand. Plaintiff's last contact with the PHS was on August 14, 1978.

### HISTORY OF THE PROCEEDINGS

On October 13, 1976, Plaintiff commenced a lawsuit against McAllister Brothers, Inc., claiming damages for the injury he sustained aboard the Tug Helen McAllister on September 8, 1975. On August 31, 1977, in connection with this lawsuit, plaintiff was examined by McAllister Brothers' physician, Dr. Balensweig. Based on Dr. Balensweig's report and confidential memorandum,[4] McAllister Brothers moved this Court, on December 13, 1977, to implead the United States as a third party defendant, based on allegations that plaintiff's condition was caused or aggravated by the malpractice of the PHS.

On May 4, 1979, plaintiff filed an administrative tort claim with the Department of Health, Education and Welfare, alleging medical malpractice by the PHS "on or about and between February 12, 1976 and August 14, 1978", i. e., during the first treatment period, the interim period, and the second treatment period. This claim was denied on August 16, 1979. Plaintiff filed the instant suit pursuant to the Federal Tort Claims Act on November 2, 1979, essentially alleging malpractice by the PHS in failing to follow up its course of treatment, in failing to diagnose plaintiff's condition correctly, and in failing to recommend surgery at a time when it could have been successful.

Defendant moves to dismiss the complaint with respect to any claims of malpractice prior to November 25, 1977, or alternatively, for partial summary judgment with respect to any such claims on the ground that they are barred by the two year statute of limitations provided by 28 U.S.C. § 2401(b). Because materials outside the pleadings have been submitted in connection with this motion, we will treat it as a motion for partial summary judgment.

Defendant alleges that plaintiff's claims of malpractice by the PHS in the first treatment period and the interim period accrued, for the purposes of the statute of limitations, no later than February 16, 1977, when he was advised by Dr. Ponnambalam that surgery was recommended for his condition. Therefore, defendant argues that plaintiff's administrative claim on May 4, 1979 was untimely because it was filed more than two years after accrual of the claim. Defendant alternatively alleges that on July 2, 1976, when plaintiff was told that his condition would improve with time, his claim accrued based on his personal knowledge at that time that his condition was deteriorating.

Plaintiff alleges that his administrative claim on May 4, 1979 was timely because his

---

**3.** Defendant concedes this point for the purposes of this motion only.

**4.** Plaintiff alleges that his counsel received a copy of Dr. Balensweig's report on January 27, 1978 and a copy of the confidential memorandum on May 30, 1978.

claim accrued on December 13, 1977 when McAllister Brothers moved to implead the United States. Until this time, plaintiff alleges that, although he was aware that he had been injured and that his condition was caused by his fall on the tug, he was unaware that his condition had deteriorated as a result of malpractice by the PHS in failing to follow up his case, in failing to diagnose his condition correctly, and in failing to recommend surgery. Plaintiff also relies on a continuous treatment theory to toll the statute of limitations until the end of the second treatment period. Finally, plaintiff contends that, even if his claim accrued on February 16, 1977 when surgery was recommended by Dr. Ponnambalam, his claim on May 4, 1979 was timely because the impleader of the United States by McAllister Brothers on December 13, 1977 gave the United States sufficient notice of plaintiff's claim to satisfy the purposes of the statute of limitations set forth in 28 U.S.C. § 2401(b).

### Purposes of Statutes of Limitations

■ Section 2401(b), like all statutes of limitations, is a statute of repose, designed to afford a reasonable time for the presentation of claims, while protecting defendants and courts from adjudication of stale claims and the attendant problems of unavailable witnesses, faded memories and lost evidence. *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 357, 52 L.Ed.2d 259 (1979). To accomplish these purposes, Congress provided a strict two year statute of limitations, computed from the date of accrual of the claim, in the Federal Tort Claims Act, as a condition to the waiver of the sovereign immunity of the United States. *Id.*; 28 U.S.C. § 2401(b).

■ The federal courts, in construing 28 U.S.C. § 2401(b), can neither expand nor narrow the waiver of sovereign immunity intended by Congress. *Kubrick, supra*, at 117–118, 100 S.Ct. at 357–358. Therefore, we cannot find plaintiff's claim timely based on the general purposes of statutes of limitations if it was filed more than two years after it accrued, even though the United States was previously impleaded by McAllister Brothers and arguably had notice of plaintiff's claim. *See id.; Rosario v. American Export-Isbrandtsen Lines, Inc.*, 531 F.2d 1227, 1234 (3d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). However, in order to determine whether plaintiff's claim is timely, we must determine when the claim accrued, a question which has not been addressed by Congress, but which has been addressed by the federal courts. *See Kubrick, supra*, at 119 n.6, 100 S.Ct. at 358 n.6; *Lee v. United States*, 485 F.Supp. 883, 886 (E.D.N.Y.1980).

### Accrual of Plaintiff's Claim

■ In general, pursuant to section 2401(b), "a claim for malpractice accrues against the government when the claimant discovered, or in the exercise of reasonable diligence should have discovered the acts constituting the alleged malpractice." *Quinton v. United States*, 304 F.2d 234, 240 (5th Cir. 1962).[5]

This rule derives from *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), which held that Urie's cause of action for silicosis under the Federal Employers' Liability Act was not barred by the three year statute of limitations because of Urie's "blameless ignorance" of the "inherently unknowable" facts of his work related injury until the disease manifested itself. *Id.* at 169–70, 69 S.Ct. at 1024–1025. *See* Note, *Developments in the Law—Statutes*

---

**5.** *See Kubrick, supra*, at 120 n.7, 100 S.Ct. at 358 n.7; *Stoleson v. United States*, 629 F.2d 1265, 1269 (7th Cir. 1980); *Hulver v. United States*, 562 F.2d 1132, 1134 (8th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *Sanders v. United States*, 551 F.2d 458, 460 (D.C. Cir. 1977); *Reilly v. United States*, 513 F.2d 147, 148 (8th Cir. 1975); *Portis v. United States*, 483 F.2d 670, 672 n.5 (4th Cir.

1973); *Tyminski v. United States*, 481 F.2d 257, 263 (3d Cir. 1973); *Toal v. United States*, 438 F.2d 222, 224–25 (2d Cir. 1971); *Hungerford v. United States*, 307 F.2d 99, 102 (9th Cir. 1962), *overruled on other grounds, Ramirez v. United States*, 567 F.2d 854 (9th Cir. 1977); *Accardi v. United States*, 372 F.Supp. 205, 206 (S.D.N.Y. 1974).

*of Limitations,* 63 Harv.L.Rev. 1177, 1204–05, 1207 (1950).

In *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court addressed the question whether the discovery rule applies to a claimant who knows the fact and cause of his injury, but who is unaware that his legal rights have been violated. The Court concluded that it does not, reasoning as follows:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Id.* at 122, 100 S.Ct. at 359.

In *Kubrick,* the claimant sustained an independent injury—deafness in one ear—as a result of negligent treatment by the Veterans' Administration Hospital—irrigation of an infection with Neomycin. *Id.* at 113–14, 100 S.Ct. at 355. The Court, in rejecting Kubrick's contention that his claim did not accrue until he knew that his legal rights had been violated, stressed that Kubrick was aware of the fact of his injury shortly after the treatment with Neomycin and learned of the connection between the treatment and his injury more than two years before he filed his administrative claim. *Id.* at 118, 121, 100 S.Ct. at 357, 359. Thus, although he sued within two years of learning that his legal rights were violated,

Kubrick's claim was barred by 28 U.S.C. § 2401(b). *Id.* at 123–24, 100 S.Ct. at 360–361.

As noted *supra,* defendant contends that plaintiff's cause of action accrued on July 2, 1976, when he was discharged from the PHS, and when he was aware that his condition was deteriorating, contrary to Dr. Taboada's statement that his condition would improve with time. Defendant alternatively argues that plaintiff's cause of action accrued no later than February 16, 1977, when Dr. Ponnambalam recommended surgery for plaintiff's condition. Plaintiff contends that his cause of action for malpractice by the PHS accrued on December 13, 1977, when McAllister Brothers moved to implead the United States based on the alleged malpractice of the PHS.

■ Plaintiff's cause of action did not accrue on July 2, 1976. On July 2, 1976, plaintiff was aware that his condition was deteriorating, but he asserts that he attributed the cause of his injury to the accident aboard the Tug Helen McAllister, not to the negligence of the PHS. This attribution of cause was reasonable. Plaintiff had not discovered, nor would the obligation to exercise reasonable diligence have caused him to discover the negligence of the PHS at this time. When plaintiff was told by Dr. Taboada that his condition would improve with time, and that nerve injuries sometimes take a long time to heal, he was entitled to accept and rely upon the diagnosis of his doctor, although, at the time, he felt his condition was deteriorating. *See Reilly v. United States, supra* at 150; *Tyminski v. United States, supra,* at 264; *Toal v. United States, supra* at 225; *Lee v. United States, supra* at 887.

On February 16, 1977, plaintiff was aware that his ulnar nerve condition had not improved with time, and he was informed by Dr. Ponnambalam that surgery was recommended for his condition. Although he was not told by Dr. Ponnambalam that his condition was caused or exacerbated by negligence of the PHS, on February 16, 1977, plaintiff should have, in the exercise of reasonable diligence, discovered

the alleged negligence of the PHS in failing to properly diagnose his condition, to properly follow up its treatment of that condition, and to recommend surgery. Plaintiff's cause of action thus accrued on February 16, 1977. Plaintiff was not at the mercy of the PHS on February 16, 1977, and it was incumbent upon him to inquire about his legal rights against the PHS within two years of learning the "critical facts" of injury and causation. *See Kubrick, supra* at 122, 123, 124, 100 S.Ct. at 359, 360, 361. Plaintiff's failure to so inquire cannot be characterized as based on "blameless ignorance" which would suspend the statute of limitations.

■ In accordance with our determination that plaintiff's cause of action accrued on February 16, 1977, plaintiff's contention that his cause of action accrued on December 13, 1977, when McAllister Brothers impleaded the United States, must be rejected. This contention is grounded on the premise that, although plaintiff was aware of the critical facts of causation and injury on February 16, 1977, his cause of action did not accrue until he learned of his legal rights with respect to the PHS through the impleader on December 13, 1977. This precise premise was rejected in *Kubrick. See id.*

Defendant asserts that plaintiff should be precluded from raising all of his claims of malpractice during the interim period even though his administrative claim, filed on May 4, 1979, was filed within two years of the last six months of the interim period (May 4, 1977 to November 25, 1977). As noted above, we cannot narrow or expand the two year statute of limitations provided in 28 U.S.C. § 2401(b). *See id.* at 117–18, 100 S.Ct. at 357–358. Nor can we find as a matter of law that the PHS committed no malpractice from May 4, 1977 to November 25, 1977. However, plaintiff's only allegation of malpractice during the interim period is that the PHS failed to follow up plaintiff's condition and arrange an appointment subsequent to July 2, 1976 to monitor the condition and failed to recommend surgery. As stated above, this claim

of malpractice accrued on February 16, 1977, when Dr. Ponnambalam recommended surgery for plaintiff's ulnar nerve condition. Plaintiff's malpractice claim for the period from May 4, 1977 to November 25, 1977 is identical to the claim which accrued on February 16, 1977, and therefore that claim is also barred by 28 U.S.C. § 2401(b) because it was filed more than two years after it accrued. The alleged continued nonfeasance of the PHS subsequent to February 16, 1977 does not extend the statute of limitations.

### Continuous Treatment

■ Plaintiff contends that the statute of limitations provided by 28 U.S.C. § 2401(b) should be tolled until the end of the second treatment period based on the well recognized continuous treatment theory first enunciated in *Kossick v. United States,* 330 F.2d 933 (2d Cir.) *cert. denied,* 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964). The continuous treatment toll is based on the confidential nature of the physician-patient relationship. *See Ciccarone v. United States,* 486 F.2d 253, 256–57 (3d Cir. 1973); *Tyminski v. United States, supra,* at 264; *Brown v. United States,* 353 F.2d 578, 580 (9th Cir. 1965); *Miller v. United States,* 458 F.Supp. 363, 365–66 (D.Puerto Rico 1978); *Accardi v. United States,* 356 F.Supp. 218, 222 (S.D.N.Y.1973).

■ Plaintiff alleges that he was treated continuously by the PHS from February 12, 1976 to August 18, 1978, although he did not have any contact with the PHS during the interim period, *i. e.,* between July 2, 1976 and November 25, 1977. Plaintiff argues that when he was "discharged" from the PHS neurology clinic and was told that his condition would improve with the passage of time, his treatment at the PHS had not necessarily ended. He relies on Dr. Taboada's deposition testimony that the term "discharge" refers to the fact that no return appointment has been scheduled: the patient's case is not closed, and it is up to the patient to schedule a return appointment at his option, perhaps in two weeks or a month. Plaintiff also points out that Dr.

Ponnambalam testified at a deposition that he did not "treat" plaintiff's ulnar nerve condition,[6] and that upon plaintiff's return to the PHS, he was seen by Dr. Taboada, among other physicians.

Defendant responds that the 17 month interim period during which plaintiff had no contact with the PHS, combined with plaintiff's contact during that period with private physicians, indicates that plaintiff's treatment by the PHS lacked the continuity required by *Kossick*. We agree.

■ When plaintiff was "discharged" from the PHS on July 2, 1976, his case was not closed and he had the option of making a return appointment in the future. Yet, he did not exercise this option to continue his treatment at the PHS, and he therefore did not maintain a physician-patient relationship with the PHS physicians. Moreover, as a seaman, he had a continuing right to demand treatment from the PHS, but the mere existence of this right, without its exercise, is not sufficient to provide the continuity needed to toll the statute of limitations. *See Kossick v. United States, supra* at 936. Finally, the fact that Dr. Taboada examined plaintiff in the second treatment period is not sufficient to constitute "continuous [treatment] by the same doctor (or an associate) or the same hospital" during the first treatment period, the interim period and the second treatment period. *Camire v. United States*, 535 F.2d 749, 750 (2d Cir. 1976). Plaintiff's treatment by the PHS was not continuous through the interim period, and the two year statute of limitations for his claims of malpractice during the first treatment period and the interim period cannot be tolled based on the continuous treatment theory.

**6.** Dr. Ponnambalam did, however, examine, test and diagnose plaintiff's ulnar nerve condition.

**7.** It should be noted that plaintiff's rights against McAllister Brothers are not affected by dismissal of his claims against the United

For the reasons stated herein, defendant's motion for partial summary judgment as to plaintiff's claims of malpractice by the PHS between February 12, 1976 and November 25, 1977 is granted.[7] All parties to the instant suit and *Mortensen v. McAllister Brothers* are hereby directed to attend a pre-trial conference on November 17, 1980 at 9:30 A.M. to discuss the future course of this litigation.

SO ORDERED.

## APPENDIX "A"

### Chronology of Events

| | |
|---|---|
| September 8, 1975 | —tug accident |
| September 19, 1975 | —treatment at Community Memorial Hospital, Toms River, N. J. |
| February 12, 1976 | —first treatment period at PHS begins |
| July 2, 1976 | —first treatment period at PHS ends; plaintiff "discharged"; interim period begins |
| October 13, 1976 | —plaintiff sues McAllister Brothers, Inc. (tug owner) |
| December 1, 1976 | —treatment at Community Memorial Hospital relating to bus accident |
| December 6, 1976 December 29, 1976 February 9, 1977 | —examinations, tests and diagnosis by Dr. Ponnambalam |
| February 16, 1977 | —Dr. Ponnambalam recommends surgery for plaintiff's ulnar nerve condition |
| May 4, 1977 | —two years before plaintiff's administrative claim filed |
| August 31, 1977 | —plaintiff examined by McAllister Brothers' physician |
| November 25, 1977 | —interim period ends; second treatment period at PHS begins |
| December 13, 1977 | —United States impleaded by McAllister Brothers |
| April 5, 1978 | —operation at PHS |
| June 2, 1978 | —operation at PHS |
| August 14, 1978 | —last contact with PHS |
| May 4, 1979 | —plaintiff's administrative tort claim filed with H. E. W. |
| August 16, 1979 | —plaintiff's administrative claim denied by H. E. W. |
| November 2, 1979 | —plaintiff's suit against the United States commenced |

States. The malpractice of the PHS, if any, was a foreseeable treatment force, for which McAllister Brothers, the alleged initial tortfeasor, will be liable if plaintiff prevails on his claims against McAllister Brothers. *See* W. Prosser, Law of Torts at 278–79 (4th ed. 1971).