**Dawn Marlene HANCE, As Mother and Natural Guardian of Kevin C. Hance and Dawn Marlene Hance, Individually, Plaintiffs,**

v.

**UNITED STATES of America, United States Department of the Air Force, USAF Regional Hospital, Eglin, Defendants.**

No. CIV–88–1262S.

United States District Court,
W.D. New York.

Sept. 5, 1991.

---

Elizabeth Ciambrone, Gibson, McAskill & Crosby, Buffalo, N.Y., for plaintiffs.

Dennis C. Vacco, U.S. Atty. by Mark S. Perla, Asst. U.S. Atty., Buffalo, N.Y., for defendants.

## DECISION AND ORDER

SKRETNY, District Judge.

Defendants bring this motion for summary judgment pursuant to Fed.R.Civ.P. 56, on the grounds that this Court lacks subject matter jurisdiction because plaintiffs failed to present their claim brought pursuant to the Federal Tort Claims Act (the "Act") to the appropriate federal agency within two years of its accrual, as required by the Act, 28 U.S.C. § 2401(b).

In support of the motion, defendants submit a memorandum of law with exhibits ("Defendants' memo"), and a reply memorandum ("Defendants' reply"). In opposition to the motion, plaintiffs submit a memorandum of law with exhibits ("Plaintiffs' memo"). I also heard oral argument on March 6, 1991.

For the reasons discussed below, defendants' motion is denied. Furthermore, because the undisputed facts show that the claim did not accrue more than two years before September 25, 1987, summary judgment on the issue of the timeliness of plaintiffs' claim is granted in favor of plaintiffs.

## FACTS

Plaintiff Dawn M. Hance ("Dawn") commenced this medical malpractice action under the Act on November 16, 1988 on her own behalf and on behalf of her infant son Kevin C. Hance ("Kevin"). Plaintiffs' amended complaint seeks damages for allegedly negligent prenatal, natal and postnatal care rendered to plaintiffs by defendants in connection with Dawn's pregnancy with and subsequent delivery of Kevin. (Amended Complaint, ¶ Thirteenth). Plaintiffs allege that, as a result of such negligence, Kevin suffered brain damage. (Plaintiff's memo, at 3).

The following facts are not in dispute. Dawn became pregnant in the summer of 1981 by her husband at the time, Walter Hance, a member of the United States Air Force. (Exhibit A, attached to defendants' memo, at 12). At the time she became pregnant, Dawn was living with Walter and their two children at Keisler Air Force Base ("Keisler") in Biloxi, Mississippi, where Walter was stationed. During her pregnancy, Dawn and the two children moved from Keisler to Buffalo, New York, then back to Keisler, and finally to Eglin Air Force Base ("Eglin") in Eglin, Florida. (*Id.*, at 12–23). Dawn's pregnancy was first diagnosed in Buffalo, where she received her initial prenatal care, (*Id.*, at 14), and she received additional prenatal care at Keisler and at Eglin. (*Id.*, at 17–20; 31–39).

On April 23, 1982, Dawn was admitted to defendant USAF Regional Hospital Eglin (the "Hospital") and on April 26, 1982, at approximately 3:50 a.m., Dawn gave birth to a baby girl ("Kathy"). Shortly after Kathy's birth, a twin was discovered. This twin was Kevin, who was delivered at approximately 4:10 a.m., twenty minutes after Kathy. Both parties agree that a multiple birth was unexpected and that Kevin was not discovered until after Kathy was delivered.

Approximately four months after the twins were born, Dawn noticed that Kevin appeared to be developing slower than Kathy. (Exhibit A, at 137–38). At six months of age, Kevin underwent a developmental test, the results of which indicated that he was developmentally delayed. (*Id.*, at 145–46). Kevin underwent additional tests, and by February 1984, when Dawn applied for Supplemental Security Income ("SSI") benefits for Kevin, Dawn already had been told that Kevin's condition "fell within a mild range of mental retardation." (*Id.*, at 176).

At some time in late 1983 or early 1984, Walter Hance was transferred from Eglin to Japan. Dawn decided to move to Buffalo with the four children. (*Id.*, at 174). At that time, Dawn obtained some of Kevin's medical records from Eglin. Dawn did not obtain all of Kevin's medical records until after the administrative claim was filed with the Department of the Air Force.

On September 6, 1984, Kevin was examined by Robert E. Cooke, M.D. in connection with Dawn's application for SSI benefits for Kevin. Dr. Cooke sent a letter dated August 23, 1985 to Kevin's pediatrician, reporting the results of that exami-

nation. Dawn received a copy of the August 23 letter. Dr. Cooke wrote to Kevin's pediatrician that Kevin suffered from "global developmental delay." (Exhibit H, attached to defendants' memo). Addressing the possible cause of Kevin's condition, Dr. Cooke wrote that "[t]he long delay in the delivery process is worrisome, but there was no immediate perinatal difficulty that might indicate an asphyxial episode in that 20 minutes of delay between the birth of the first and second babies." (*Id.*)

In 1986 Dawn consulted attorney John Trigilio on a matter unrelated to this lawsuit. When Trigilio learned of Kevin's condition, he referred Dawn to Elizabeth Ciambrone, an attorney experienced in medical malpractice involving brain-damaged babies. Plaintiffs thereafter presented their administrative claim to the Department of the Air Force on September 25, 1987. After final denial of the claim on June 1, 1988, this action was commenced.

## DISCUSSION

■ At issue on this motion is when plaintiffs' claim accrued. The Act provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). However, the Act itself is silent as to when a claim brought pursuant to it accrues. Consequently, Courts have held that a medical malpractice claim brought pursuant to the Act accrues when "... the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause." *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982), citing *United States v. Kubrick,* 444 U.S. 111, 120, n. 7, 100 S.Ct. 352, 358, n. 7, 62 L.Ed.2d 259 (1979). In *Kubrick,* the Court refused to hold that accrual "must await awareness by the plaintiff that his injury was negligently inflicted." *Kubrick,* 444 U.S. at 122–23, 100 S.Ct. at 359–60.

■ Fed.R.Civ.P. 56(c) mandates summary judgment when the moving party demonstrates "that there is no genuine is-

sue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must affirmatively demonstrate that the nonmoving party's evidence is insufficient to establish an essential element of his claim. *Celotex v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The district court must draw all reasonable inferences in favor of the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Further, the function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991).

Based on the undisputed facts as set forth above, it is apparent that Dawn knew of the existence of Kevin's injury more than two years before September 25, 1987, the date on which the claim was presented to the appropriate federal agency. Thus, the disagreement between the parties as to when the claim accrued focuses on when Dawn knew or should have known that Kevin's injury may have been caused by defendants' actions. Defendants argue that the claim accrued in August 1982, and in no event did it accrue later than August 1985. Plaintiffs argue that the claim did not accrue until the summer of 1986, when attorney Ciambrone suggested to Dawn for the first time that Kevin's injury may have been caused by the defendants.

### Accrual in 1982

■ Defendants first argue that both prongs of the accrual test were satisfied in August 1982. At that time Dawn had noticed that Kevin was not developing as quickly as Kathy and she was also aware of both the unusual circumstances surrounding her unexpected delivery of twins and the fact that Kevin's delivery was difficult and long. (Defendants' memo, at 17–19).

Dawn's knowledge of these facts is not sufficient to trigger accrual. In response to Dawn's inquiries regarding her unexpected delivery of twins, medical personnel at the Hospital told her, in substance, "... it's no big deal ..." (Exhibit A, at 122), "[i]t's not unusual" (*Id.*, at 123), and "... it happens." (*Id.*, at 130). Dawn testified that no one had alerted her to any problems Kevin had experienced at birth (*Id.*, at 121). In response to Dawn's concerns about Kevin's apparent delays at four months, she was told that "... second twins are slower than first ... he will catch up." (*Id.*, at 138). At six months, she was told "[t]he same thing. He'll catch up." (*Id.*, at 140). Defendants do not deny that these representations were made to Dawn.

In *Mendez by Martinez v. United States,* 655 F.Supp 701 (S.D.N.Y.1987), plaintiff's grandson did not breathe and had no discernible heartbeat for seven minutes after birth. In response to his father's inquiry immediately after birth as to why the baby was born that way, the doctor replied, "[t]hat's the way some children are born." *Id.,* 655 F.Supp. at 702. When the baby was approximately fourteen months old, he was diagnosed with epilepsy and other problems. In response to the inquiry of his grandmother (his legal guardian) as to the cause of the epilepsy, a doctor told her, "a lot of people have that." *Id.,* 655 F.Supp. at 703. Nearly five years after the baby was born, the grandmother read a newspaper article about a brain-damaged child who received a monetary settlement from the hospital in which she was born. The grandmother and the father contacted an attorney and the grandmother filed an administrative claim within two years of seeing the article.

The court held that the claim was timely. In summarizing the knowledge the father and grandmother possessed before seeing the newspaper article, the court said:

> ... [The father and grandmother] were presented with a very sick infant who required continuous attention as he grew. They were informed that some babies were born that way. No event occurred from the time of birth to the time of reading the newspaper article that would have stimulated a reasonable person in claimant's position to inquire further as to the true source of the injury. Rather, we believe [the father and grandmother] only knew, or should have known, that [the child] was afflicted with serious illness complications which often arise from natural causes and not from improper handling.

*Id.,* 655 F.Supp. at 707. The court reasoned that to hold that the claim was untimely would eviscerate the second prong of the accrual test, in that it would require a reasonable person armed with only knowledge of serious injury "to delve further into the cause of the injury." *Id.*

Likewise, in this case Dawn's inquiries as to the unexpected birth of twins and Kevin's apparent developmental delays were explained away by medical personnel. Dawn did not know, nor should she have, that Kevin's unexpected birth or his subsequent apparent developmental problems were anything other than "... complications which often arise from natural causes and not from improper handling." *Id.* Therefore, I reject defendants' argument that plaintiffs' claim accrued in 1982.

*Accrual in 1984*

■ Alternatively, defendants argue that even if Dawn's knowledge in 1982 did not trigger accrual, by 1984 Dawn had sufficient knowledge of the cause of Kevin's injury for the claim to accrue. First, defendants allege that Dawn told medical personnel in December 1983 that she thought Kevin had problems breathing at birth, (Defendants' memo, at 22; Exhibit E, attached to defendants' memo), and that such statement by Dawn demonstrated her knowledge of the cause of Kevin's injury.[1] Second, defendants submit the affidavit of Walter Hance, sworn to on August 22, 1990 (Exhibit C, attached to defendants' memo), in which Walter states that he observed

---

1. Dawn flatly denies that she made this statement to medical personnel or that she had such knowledge in 1983. (Exhibit A, at 168–69; 171).

Kevin's birth, noticed that Kevin was "very pale in color," "appeared limp" and had his umbilical cord wrapped around his neck. (Exhibit C, ¶¶ 3–5). Third, defendants argue that Dawn received Kevin's medical records from Eglin before returning to Buffalo in 1984, which records "formed the basis of the ultimate conclusion by Dr. Cooke as to the cause of the injury...." (Defendants' memo, at 22). Defendants thus urge that Dawn was armed in 1984 with all the facts she needed to determine the possible cause of Kevin's injury.

First, even if Dawn knew in 1983 that Kevin had trouble breathing at birth, knowledge of this fact would be insufficient to trigger accrual. In *Lee v. United States*, 485 F.Supp. 883 (E.D.N.Y.1980), the plaintiff/father knew from the time his brain-damaged daughter was born "that lack of oxygen to the brain could cause damage and that [his daughter] had stopped breathing due to the filling of her lungs with fluid." *Id.*, 485 F.Supp. at 886. The court ruled that this knowledge was insufficient to cause the claim to accrue. Accrual did not occur until the father had been told by a doctor that his daughter's problem was due to "an insult at the time of birth," and later by another doctor "that the cause of the brain damage was mismanagement of the delivery." *Id.*, 485 F.Supp. at 885. Before that, the father "... could reasonably have believed that the condition was totally unrelated to anything the doctors did." *Id.*, 485 F.Supp. at 887. Thus, even if Dawn was aware that Kevin had breathing problems at birth, knowledge of this fact would not have triggered accrual. *See also Mendez by Martinez v. United States*, 655 F.Supp. at 706 (plaintiff's knowledge that the medical cause of newborn's injury was "possibly lack of oxygen to the brain" did not cause claim to accrue).

Second, defendants argue that Walter Hance's affidavit setting forth his observations of Kevin's delivery is evidence that *Dawn* knew "full well the problems mani-

fested during birth...." (Defendants' memo, at 22). In their reply memorandum, defendants frame the issue as whether "the *Hances* were unaware of the problems at birth." (Defendants' reply, at 2) (emphasis added). However, Walter Hance is not a plaintiff in this lawsuit. The facts of which he was aware with regard to Kevin's delivery are irrelevant unless he relayed them to Dawn. Defendants have not produced evidence which shows that Walter ever did so, or that Dawn had any independent knowledge of Kevin's condition at birth.

Dawn testified at her deposition that although she heard Kevin cry immediately after he was born, she did not get a chance to see him. (Exhibit A, at 84–85). She did not see whether oxygen was administered to him, and heard no comments regarding his ability to breathe, his color or his general condition. (*Id.*, at 85). Her husband said nothing to her about Kevin's condition. (*Id.*, at 94). She testified repeatedly that no medical personnel told her any details of Kevin's condition or that Kevin required any medical care different from that which was being provided to Kathy. (*Id.*, at 88; 94; 98–99; 104–05; 112; 119; 121). Thus, the information in Walter Hance's affidavit does not show that Dawn knew the cause of Kevin's injury in 1984.

Third, defendants' argument that the medical records which Dawn possessed in 1984 imparted her with knowledge of the cause of Kevin's injury attempts to brush aside the fact that this first set of medical records did not reflect that Kevin had suffered any problems at birth. Rather, those records indicated that Kevin's condition at birth was "good", that he had a "strong" cry, that no resuscitation or respiratory stimulant was used, that his respiration was established in 30 seconds, that there was no oxygen in the delivery room and that his total Apgar[2] was 7/8. (Exhibit B, attached to plaintiffs' memo). The facts which Dawn could glean from such records

---

**2.** The Apgar score is an "evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of 5 criteria: 1) heart rate, 2) respiratory effort, 3) muscle tone, 4) response stimulation [cry], and 5) skin color; a score of 10 indicates the best possible condition." *Stedman's Medical Dictionary*, 25th ed., 1395.

in no way put her on notice that Kevin's injury may have been caused by the manner in which defendants handled his delivery. *See Mendez by Martinez v. United States*, 655 F.Supp. at 708 (receipt of medical records did not satisfy knowledge requirement of *Kubrick*).

Therefore, I also reject defendants' argument that plaintiffs' claim accrued in 1984.

*Accrual in 1985*

■ Finally, defendants argue that, at the very least, Dr. Cooke's August 23, 1985 letter to Kevin's pediatrician, which termed the delay in Kevin's delivery as "worrisome," made Dawn aware that defendants may have caused Kevin's injury. Defendants urge that after reading this letter, "[a] reasonable person would certainly have suspected that some sort of malpractice occurred when there was a multiple birth with no preparation or forewarning." (Defendants' memo, at 22–23). Thus, measuring accrual from the date of this letter, the administrative claim filed more than two years later would be untimely.

Plaintiffs argue that Dr. Cooke's letter did not isolate the delivery delay as the cause of Kevin's injury, but rather, merely termed the delay "worrisome." (Plaintiffs' memo, at 20). Further, although Dr. Cooke questioned the delivery delay, he ruled it out as the cause of Kevin's injury because there was "... no immediate perinatal difficulty that might indicate an asphyxial episode...." I agree with plaintiffs that this August 23, 1985 letter cannot be the basis for accrual.

I find that Dawn reasonably relied on Dr. Cooke's letter which apparently ruled out the delivery delay as the cause of Kevin's injury. Other Circuits have held that "... plaintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances of doctors." *Chamness by Chamness v. United States*, 835 F.2d 1350, 1353 (11th Cir.1988). *See also Otto v. National Institute of Health*, 815 F.2d 985, 989 (4th Cir.1987) (plaintiff received "reasonable and credible explanations for the procedure and the complications that ensued.").

Further, *Nemmers v. United States*, 681 F.Supp. 567 (C.D.Ill.1988), *aff'd*, 870 F.2d 426 (7th Cir.1989), is instructive. There, plaintiffs' son was delivered by caesarian section after a difficult labor. The child was mentally retarded and suffered from cerebral palsy. *Id.*, 681 F.Supp. at 569. A letter from a Dr. Copps approximately four years after their son was born informed plaintiffs that their son's condition could be due to "... a relatively severe influenza-like high fever illness [the mother had] at about the 3rd month of ... pregnancy ... the fetal distress experienced during labor merely being a reflection of the pre-existent problem and not because of the trauma of delivery although that may have also contributed to his present condition somewhat." *Nemmers*, 870 F.2d at 428. Over eight years after their son's birth, plaintiffs read a newspaper article describing the settlement of a medical malpractice claim brought by the parents of a child who suffered brain damage due to an oxygen deficiency at birth caused by a delayed caesarean section. The court held that plaintiffs neither knew nor should have known prior to reading the article of a potential government cause of their son's injury. To expect the parents to have gleaned a potential government cause from Dr. Copps' letter or to have been more diligent in pursuing or investigating a potential cause because of it was more than the duty of reasonable care and diligence required. *Nemmers*, 681 F.Supp. at 572.

In this case, Dr. Cooke's letter told Dawn even less than Dr. Copps' letter told the *Nemmers* plaintiffs. In *Nemmers*, plaintiffs learned from the letter that "the trauma of delivery" may have contributed to their son's condition. This was insufficient to trigger accrual. Here, Dawn learned much less from Dr. Cooke's letter; she learned only that Dr. Cooke thought the delivery delay "worrisome," but that there was no evidence that an "asphyxial episode" occurred during the delay. I find that Dr. Cooke's letter, which described a certain aspect of Kevin's birth as worrisome, but went on essentially to rule it out as a possible cause of Kevin's injury, would not cause a reasonable person in Dawn's

position to suspect that Kevin's injury was caused by the government.

Therefore, I reject defendants' argument that the claim accrued in August 1985 upon Dawn's receipt of Dr. Cooke's letter.

Moreover, I further find that the undisputed facts show that the claim did not accrue more than two years before September 25, 1987. Therefore, summary judgment on the issue of the timeliness of plaintiffs' claim is granted in favor of plaintiffs.

I recognize that plaintiffs have not formally cross-moved for summary judgment. However, a district court may grant summary judgment in favor of a non-moving party when no genuine issues of material fact have been shown. *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983). *See also Siderius, Inc. v. M.V. Ida Prima*, 613 F.Supp. 916, 923 (S.D.N.Y.1985) ("... the making of a motion for summary judgment exposes the moving party to the risk that summary judgment will be granted against him."); *Suffolk County Patrolmen's Benevolent Ass'n. Inc. v. County of Suffolk*, 595 F.Supp. 1471, 1482 (E.D.N.Y.1984), *aff'd*, 751 F.2d 550 (2d Cir. 1985) (formal cross-motion not necessary to grant summary judgment in favor of non-moving party in the absence of a genuine issue as to any material fact). I find that the undisputed facts in this case compel the conclusion that plaintiffs' claim is timely.

From the time Kevin was born Dawn received assurances that Kevin's unexpected birth was not unusual and that she should not worry about it. No evidence shows that Dawn was aware that Kevin had experienced any problems at birth. She testified that "I heard him cry and that was all. That put my mind at ease." (Exhibit A, at 99). Medical records she received in 1984 indicated that Kevin's condition at birth was "good". Dr. Cooke's letter, even when viewed most favorably to defendants, indisputably downplayed the significance of the delivery delay. It was not until Dawn met with attorney Ciambrone in 1986 that anyone suggested to Dawn that Kevin's condition may have been caused by a mishandling of Dawn's pregnancy or Kevin's delivery. As dis-

cussed in detail above, none of defendants' evidence shows otherwise.

Defendants also argue that accrual cannot be triggered by the occurrence of the "doubly fortuitous events" of Dawn having met with a lawyer on an unrelated matter who referred her to his wife (Ms. Ciambrone) who was an expert in malpractice cases involving brain-damaged babies. (Defendants' reply, at 6). However, courts have not been hesitant to measure accrual from the time knowledge of possible causation was obtained under fortuitous circumstances. *See Nemmers v. United States, supra*, 681 F.Supp. 567 (C.D.Ill.1988), *aff'd*, 870 F.2d 426 (7th Cir.1989) (newspaper article); *Chamness by Chamness v. United States, supra*, 835 F.2d 1350 (11th Cir. 1988) (television show; question of fact as to accrual); *Jastremski v. United States*, 737 F.2d 666 (7th Cir.1984) (neurologist's social visit to plaintiffs' home); *Mendez by Martinez v. United States, supra*, 655 F.Supp 701 (S.D.N.Y.1987) (newspaper article).

Accordingly, defendants' motion for summary judgment is denied and summary judgment on the issue of the timeliness of plaintiffs' claim is granted in favor of plaintiffs.

## CONCLUSION

For the reasons articulated above, I find that plaintiffs' claim under the Federal Tort Claims Act is not barred by 28 U.S.C. § 2401(b). Furthermore, I find that plaintiffs' claim is timely.

## ORDER

IT HEREBY IS ORDERED, that defendants' motion for summary judgment is DENIED.

IT FURTHER IS ORDERED, that summary judgment on the issue of the timeliness of plaintiffs' claim is granted in favor of plaintiffs.

SO ORDERED.