**Victor HERRERA-DIAZ, a Minor, By and Through his Guardian, Janet Mary HERRERA-DIAZ, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, DEPARTMENT OF the NAVY, Defendant-Appellee.**

**No. 86-6242.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted December 10, 1987.

Decided May 4, 1988.

Peter J. McNulty, Law Offices of Peter J. McNulty, Bel Air, Cal., for plaintiff-appellant.

Kathryn A. Snyder, Asst. U.S. Atty., Civil Div., San Diego, Cal., for defendant-appellee.

Before WALLACE, NORRIS and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Victor Herrera-Diaz, a youngster who suffers from cerebral palsy, appeals from a summary judgment dismissing his action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq. The district court concluded that Victor's medical negligence claim which he filed in 1984 was barred by the two-year statute of limitations of 28 U.S.C. § 2401(b). The court determined the claim accrued in 1978, approximately six months after Victor was born, at which time Victor's mother discovered that his cerebral palsy probably was caused by a lack of oxygen to his brain at or near the time of his birth.

Victor argues on appeal that (1) his cause of action did not accrue until 1984 when his mother first learned that negligence of Navy medical personnel may have caused his injury; and (2) even if the claim accrued earlier, the government fraudulently concealed and misrepresented the true cause of Victor's injury and this tolled the statute of limitations. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I

## FACTS

Victor was born two months premature on November 8, 1977 at the Naval Regional Medical Center at Camp Pendleton, California. Approximately seven hours after his birth, Victor was transferred to Children's Hospital in San Diego suffering from what Navy medical personnel described to his mother as "breathing problems." Mrs. Herrera-Diaz made no inquiry regarding these problems or their cause. Victor appeared to her to be somewhat blue and dark in color; she assumed the reported

breathing problems were the result of Victor having been born premature.

Victor remained in Children's Hospital for five months. When he was three months old, a treating physician told Mrs. Herrera–Diaz that Victor had suffered brain damage. The physician did not say what might have caused the brain damage and Mrs. Herrera–Diaz did not ask. Regarding her lack of inquiry, she stated: "I guess I really didn't want to know. Brain damage is enough for me. I didn't ask."

In April 1978, Victor and his mother moved to New York where Mrs. Herrera–Diaz' parents lived. When Victor was six months old, doctors at Long Island Jewish Hospital in New York told Mrs. Herrera–Diaz that Victor had cerebral palsy. Mrs. Herrera–Diaz was referred to the United Cerebral Palsy Treatment and Rehabilitation Center to get specialized care for Victor. There Victor was seen by a physician who, in 1978, told Mrs. Herrera–Diaz that cerebral palsy often occurred in premature babies and was caused by a lack of oxygen to the brain around the time of birth. Mrs. Herrera–Diaz did not inquire as to what had caused the lack of oxygen. She thought that Victor was "just born like that because that's the way God wanted it." She did not consider the possibility that the lack of oxygen was caused by Navy doctors when Victor was born.

Six years later, in May 1984, Mrs. Herrera–Diaz was contacted by her present attorneys and told that Victor might have a claim against the government. Victor's administrative claim for damages was filed June 8, 1984. It was denied April 8, 1985. The present lawsuit was filed June 4, 1985. In it Victor alleged, through Mrs. Herrera–Diaz as his guardian ad litem, that Navy medical personnel had been negligent in managing his delivery, and had fraudulently concealed and misrepresented their "complicity in causing [his] birth injuries."

In dismissing Victor's lawsuit as time barred, the district court determined that Victor's medical negligence claim accrued in 1978 when Mrs. Herrera–Diaz had knowledge that Victor suffered from cerebral palsy which was caused by a lack of oxygen to his brain at or about the time he was born. The district court also dismissed the fraudulent concealment and misrepresentation claim because the government had not waived its sovereign immunity as to this claim. *See* 28 U.S.C. § 2680(h). Finally, the district court dismissed the Department of the Navy as an improper defendant in the suit.

## II

## ANALYSIS

The FTCA provides that a tort claim against the federal government must be presented to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). Tort claims usually accrue at the time of a plaintiff's injury. In medical malpractice actions under the FTCA, however, a claim does not accrue until a plaintiff discovers both the injury and its cause. *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). When the injury and its cause are known, the claim accrues even though the plaintiff may not then be aware that the injury may have been negligently inflicted. *Id.* at 123–25, 100 S.Ct. at 360–61.

In *Kubrick,* Veterans Administration doctors treated the plaintiff's leg infection with neomycin. Six weeks later the plaintiff began to suffer a loss of hearing, and approximately seven months after that, in January 1969, while being treated for deafness, doctors advised the plaintiff that it was highly possible the neomycin treatment caused his deafness. In June 1971 a doctor told the plaintiff that neomycin caused his injury and should not have been administered. The plaintiff Kubrick filed his negligence action in 1972.[1] He contended that he did not learn the "cause" of his injury until June 1971 when he was told that the use of neomycin to treat his leg

1. Kubrick presented his claim to the Veterans Administration after he filed his complaint. The Veterans Administration denied the claim in April 1973. *See Kubrick,* 444 U.S. at 115 n. 4, 100 S.Ct. at 356 n. 4.

was improper. The Court, however, held the claim time barred. It concluded that the claim accrued in January 1969 when Kubrick discovered the "critical facts" of both his injury and its cause. *Id.* at 122, 100 S.Ct. at 359.

Victor attempts to distinguish *Kubrick.* He argues that while the plaintiff in *Kubrick* was aware, more than two years before he presented his claim, that his injury was caused by neomycin administered by Veterans Administration doctors, Victor's mother was not aware that the cause of Victor's injury, a lack of oxygen to the brain, resulted from any act or omission by Navy personnel. Victor's mother believed the lack of oxygen was a "natural result" of premature birth. Victor also argues that due to his mother's youth, her separation from her husband soon after Victor was born, and her distress over Victor's condition, she was unable to form a reasonable suspicion of any negligent conduct by Navy medical personnel. Therefore, Victor argues, Mrs. Herrera-Diaz cannot be held to have been placed on notice in 1978 to make any inquiry as to how Victor's injury was caused. We disagree.

Relying on *Kubrick,* we have developed an objective standard to determine when a medical malpractice action accrues under the FTCA. The action accrues, and the statute of limitation starts to run, when a "plaintiff has discovered, or in the exercise of reasonable diligence should have discovered, both his injury and its cause." *Davis v. United States,* 642 F.2d 328, 331 (9th Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1273, 71 L.Ed.2d 459 (1982).[2]

We applied this standard in *Fernandez v. United States,* 673 F.2d 269 (9th Cir.1982). There, parents of a child who had developed a jaundiced condition shortly after his birth in 1958 "knew of the nexus between his deficiencies and his jaundice at least as early as 1964." *Id.* at 271. His claim was presented in 1976. We stated that if the parents "had inquired, and if there were merit in the case, presumably they would have learned that there was a possibility that [the child's] diagnosis and treatment came too late [to prevent] the sad after-effects of the jaundice." *Id.* We concluded that the jaundiced child's "parents knew [by 1964], or had available the means of knowing, all there was to know about the cause of his injuries, and who (the nurses and the doctors who diagnosed and treated his jaundice) were responsible." *Id.* Relying on *Kubrick* and *Davis,* we held that the child's claim was barred by the two-year statute of limitations of 28 U.S.C. § 2401(b). Although the child's parents may have been unaware that his injury was negligently inflicted, "we decline[d] to defer accrual of the claim until fault, as distinguished from injury and cause, [was] determined." *Id.* at 272.

In the present case, Mrs. Herrera-Diaz knew approximately seven hours after Victor was born that he appeared to be blue and dark in color and that he suffered from "breathing problems." When Victor was three months old, Mrs. Herrera-Diaz was told that he had brain damage, but she did not inquire about its cause. By her own admission, she did not really want to know the cause. By 1978, when Victor was approximately six months old, Mrs. Herrera-Diaz was told that Victor suffered from cerebral palsy which was caused by a lack of oxygen to the brain at or near the time of birth. At that time she knew, or in the exercise of reasonable diligence should have discovered, both Victor's injury and its cause. *See Davis v. United States,* 642 F.2d at 331. The two-year statute of limitations began to run at this point. She then had the "burden to ascertain the existence and source of fault within the statutory period.... In the absence of fraudulent concealment it [was her] burden, within the statutory period, to determine whether and whom to sue." *Id.*

2. The rule is followed in other circuits. *Nemmers v. United States,* 795 F.2d 628, 631 (7th Cir.1986) (running of the statute of limitations depends upon reactions of the objective, reasonable man); *Arvayo v. United States,* 766 F.2d 1416, 1421-23 (10th Cir.1985) (parents brought negligence action against government for child's brain damage near birth. Held: reasonable person would have made some type of inquiry).

There is no evidence of fraudulent concealment or misrepresentation in the record.

We conclude that Victor's medical negligence claim accrued in 1978, and the district court correctly dismissed his lawsuit as time barred under 28 U.S.C. § 2401(b).

AFFIRMED.

NORRIS, Circuit Judge, dissenting:

This case requires us to decide when a layperson will be deemed to know enough about the cause of a specific medical condition to be on notice that she may have been the victim of tortious conduct by medical personnel. Our precedents establish a clear-sounding rule: An action for medical malpractice under the FTCA accrues when the prospective plaintiff knew or should have known of her injury and its cause. Applying this standard, the majority holds that the statute of limitations started to run when Mrs. Herrera–Diaz was told six months after Victor's birth that a "lack of oxygen" at or near the time of delivery may have "caused" his cerebral palsy. At 1537.

I agree with the majority that whether Victor Herrera–Diaz's claim is barred by the statute of limitations depends on when Mrs. Herrera–Diaz discovered, or in the exercise of due diligence should have discovered, both her child's injury and its cause. I believe, however, that the majority has erred on two critical counts. First, Mrs. Herrera–Diaz's deposition testimony—upon which the majority exclusively relies—is thoroughly ambiguous about what she was told caused her son's injury. Her testimony cannot fairly be construed as establishing for the purpose of summary judgment that she knew or should have known the cause of Victor's cerebral palsy. Second, even if Mrs. Herrera–Diaz knew that a "lack of oxygen" caused Victor's injury, this bare knowledge of the technical medical cause of Victor's injury did not constitute the kind of "knowledge of cause" which under current case law must exist before the statute of limitations will start to run.

Although the majority suggests that when Victor was six months old Mrs. Herrera–Diaz was told that a lack of oxygen had caused her son's cerebral palsy, *id.*, her deposition indicates that the information she received was not nearly so definitive.[1] Mrs. Herrera–Diaz testified that the staff at the United Cerebral Treatment and Rehabilitation Center told her both that premature babies sometimes develop cerebral palsy and that cerebral palsy can result from a lack of oxygen at the time of delivery. It is entirely unclear from the deposition that the lack of oxygen problem was presented as a separate possible cause of the injury as opposed to simply being a part of the natural physical difficulties attendent to prematurity. Indeed, the information that Mrs. Herrera–Diaz received, as related in her deposition, was wholly con-

1. The relevant part of Mrs. Herrera–Diaz's deposition reads as follows:

Q *But Dr. Quinn or doctors at the United* Cerebral Treatment and Rehabilitative Center in Roosevelt, Long Island, they told you that premature babies sometimes develop cerebal palsy?

A Yes.

Q And did she also tell you that cerebral palsy can be caused by a lack of oxygen during the baby's delivery?

A To the brain. A lack of oxygen to the brain. *And it can come from delivery, she said.* And that was that.

Q Did she tell you it might come from some other time than delivery?

A No.

Q Do you understand my question?

A I understand what you are saying. No, I really do not remember her exact words, you know. She was just trying to tell me how children with C.P. get it.

....

Q Now, did Dr. Quinn ever tell you what *might have caused this cerebral palsy?*

A No.

Q Did you ever ask her what she thought caused it?

A No.

Q Did you have any idea at that point how cerebral palsy happens to a child?

A No, till she told me. She told me that premature babies it happens to. And a lack of oxygen. And that's it.

Q Lack of oxygen? What does lack of oxygen mean?

A That's what she said, lack of oxygen.

Q What does that mean to you, lack of oxygen? When or where?

A Delivery. When I found out he had that, I just thought it was because there was—it was meant for him to be like this....

sistent with an initial belief that Victor's injuries were a natural result of his premature delivery. In short, Mrs. Herrera–Diaz's deposition, when viewed in the light most favorable to her, does not establish that she was put on notice that lack of oxygen was anything other than a function of prematurity.

Even assuming, however, that Mrs. Herrera–Diaz knew or should have known that a lack of oxygen caused Victor's injury, in my view this is not the sort of "knowledge of cause" sufficient to trigger the statute of limitations. Knowledge of cause, like the definition of cause itself, is a slippery concept. The cause of every medical injury may be described with equal accuracy in a virtually infinite number of ways "embracing everything that has ever occurred commencing with the ultimate cause of causes up until the present instant." *Lee v. United States,* 485 F.Supp. 883, 887 (E.D.N.Y.1980). To take a simple hypothetical malpractice case, the cause of a prospective plaintiff's heart attack might be described variously as 1) the failure of the left ventrical muscle, 2) the failure of the heart muscle in response to an injection of nitroglycerin, or 3) the negligent administration of nitroglycerin by the plaintiff's physician. Similarly, a prospective plaintiff's knowledge of cause may range from nothing more than an awareness of the purely medical or scientific explanation for an injury to an informed belief that an injury was caused by actual negligence on the part of an attending doctor.

The majority apparently believes that any kind of knowledge of cause is sufficient to trigger the statute of limitations. Neither case law nor common sense compels such an simplistic definition of knowledge of cause. To trigger the statute of limitations, a prospective plaintiff must have the sort of knowledge of cause that would lead a reasonable person to investigate whether she might have been the victim of malpractice. Although suspicion of negligence is not required before the statute of limitations starts to run, bare knowledge about the mechanical or technical medical cause of injury (failure of the left ventricle muscle) is not sufficient. At a minimum, a prospective plaintiff must be aware that the injury at issue may have occurred as the result of some human act or omission (the injection of nitroglycerin) and was not merely the result of a natural physical defect. In the absence of knowledge that a human agent may have contributed to the injury, a prospective plaintiff simply has no reason to investigate potential legal remedies, and his cause of action should not accrue.

This reading of what knowledge is required to trigger the statute of limitations follows logically from the three cases upon which the majority rests its holding—*United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), *Davis v. United States,* 642 F.2d 328 (9th Cir.1981), and *Fernandez v. United States,* 673 F.2d 269 (9th Cir.1982). In *Kubrick,* a doctor had injected plaintiff's infected femur with neomycin. After Kubrick began to suffer from substantial hearing loss, a second doctor informed him that his hearing impairment probably resulted from the neomycin treatment. Kubrick argued and the Court of Appeals held that he should not be deemed to have had sufficient knowledge of cause until he knew or could be reasonably expected to know that the neomycin treatment constituted medical malpractice. The Supreme Court disagreed, holding that it was sufficient to trigger the statute of limitations that Kubrick knew "that he ha[d] been hurt and who ha[d] inflicted the injury." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359. Armed with these critical facts, Kubrick "need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action." *Id.* at 122–23, 100 S.Ct. at 359–60. In holding that Kubrick's claim accrued when he discovered the "cause" of his injury, the Supreme Court plainly was not making reference to the chemical action of neomycin on Kubrick's body, but rather to the administration of the drug by identifiable hospital personnel. Under *Kubrick,* the statute of limitations will not start to run until the prospective plaintiff "can protect himself by seeking advice in

the medical and legal community." *Id.* at 123, 100 S.Ct. at 360. Without knowledge of the human participation in the causation of his injury, Kubrick could enjoy no such protection.

Our circuit's decision in *Davis,* following *Kubrick,* also rests on the fact that the plaintiff had sufficient knowledge of the human cause of his injury to inquire about possible negligence. In *Davis,* the plaintiff had contracted polio after receiving the Sabin vaccine. We held that Davis's action accrued after he knew that he had contracted polio and that the Sabin vaccine had caused his injury. Our court rejected Davis's argument that the action should not accrue until he had reason to believe that the United States had been negligent in approving the particular batch of the vaccine from which he had been immunized. As in *Kubrick,* the plaintiff in *Davis* clearly was armed with the critical facts about his injury and could reasonably be expected to inquire about whether and whom to sue. *Davis,* 642 F.2d at 331.

*Fernandez,* upon which the majority places special emphasis, similarly applies the *Kubrick* analysis. On the third day of his life, Mark Fernandez, a prematurely born infant, was discovered to have developed jaundice. His doctors then embarked on an elaborate course of testing and treatment including several blood transfusions. Mark's condition ultimately stabilized and he was released from the hospital at which time Mark's parents were given a summary of his treatment for jaundice. Within the first 2½ years of his life, Mark developed a variety of physical and mental impairments which his mother explicitly recognized as having been caused by the jaundice. *Fernandez,* 673 F.2d at 270–71.

Over 12 years later, the Fernandez filed suit under the FTCA. In ruling that the statute of limitations barred the Fernandez' claim, we noted that for at least twelve years Mark's parents knew or had the means of knowing "all there was to know about the cause of his injuries, and who (the nurses and doctors who diagnosed and treated his jaundice) were responsible." *Fernandez,* 673 F.2d at 271. Following *Kubrick* and *Davis,* "we decline[d] to defer accrual of the claim until fault, as distinguished from injury and cause, [was] determined." *Id.* at 272. And quoting *Kubrick,* we held that the Fernandez were in "possession of the critical facts that [their son] ha[d] been hurt and who ha[d] inflicted the injury" and could "protect [themselves] by seeking advice in the medical and legal community." *Id.* at 271–72.

In sum, *Kubrick, Davis,* and *Fernandez* stand for two propositions: first, that suspicion of negligence is not required before the statute of limitations starts to run; and second, that the statute of limitations will not run until a prospective plaintiff is in possession "of the critical facts that he has been hurt and who has inflicted the injury." Absent this sort of knowledge of cause, a prospective plaintiff simply has no notice that he may have a valid lawsuit. *See Lee,* 485 F.Supp. at 887 ("In an action for medical negligence the 'cause' which is at issue is the act of the defendant which gave rise to the injury").

Mrs. Herrera–Diaz, as distinguished from the plaintiffs in *Kubrick, Davis* and *Fernandez,* simply was not in command, nor should she have been in command, of sufficient knowledge about the cause of her son's injury to prompt an inquiry into potential malpractice. Nothing that she was told by various medical personnel, including the fact that cerebral palsy may be caused by a lack of oxygen at birth, ever alerted her to the possibility that her doctors, by either act or omission, might have been negligent in handling Victor's birth. In my view, a layperson might reasonably have believed, as Mrs. Herrera–Diaz apparently did, that Victor's cerebral palsy was fully explicable as the result of a purely natural cause—his serious prematurity. Informing Mrs. Herrera–Diaz that lack of oxygen as well as prematurity can cause cerebral palsy did nothing more than inform her of a possible technical cause of her son's injury. *See Lee,* 485 F.Supp. at 887 (parent told that newborn had difficulty breathing, fluid in the lungs and had experienced decreased levels of oxygen to the brain "could reasonably have believed that the condition was wholly unrelated to

anything the doctors did"). Discovery of this technical cause simply cannot be deemed sufficient knowledge of cause to trigger the statute of limitations. Without some suggestion that a human agent might have contributed to her son's injury, Mrs. Herrera-Diaz cannot be faulted for not inquiring further about the cause of Victor's cerebral palsy. In other words, the record as it now stands fails to establish that Mrs. Herrera-Diaz had sufficient knowledge about who inflicted her son's injury. Under the *Kubrick* line of cases such knowledge is a prerequisite to the triggering of the statute of limitations.

I dissent.