892 F.2d 82
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
John P. GABBARD, et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant
 No. 88-3677.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 6, 1989.
Decided Dec. 12, 1989.
 
 Before GOODWIN, Chief Judge, and EUGENE A. WRIGHT and WILLIAM A. NORRIS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The government appeals from a $2,135,253 judgment for the plaintiffs in a medical malpractice action under the Federal Tort Claims Act (FTCA). The government contends that the claim was time-barred under the applicable statute of limitations and that excessive damages were awarded. We affirm.
 
 
 3
 Patrick Gabbard was born on April 25, 1978, at Madigan Hospital in Tacoma, Washington. His father, John Gabbard, served in the U.S. Army at that time and was stationed at Fort Lewis. His mother, Debra Gabbard, first visited Madigan Army Medical Center in February, 1978. She was designated as a high-risk patient and assigned to the special obstetrical clinic on April 5, 1978. Ultrasound tests were performed to clarify her exact due date, but the results were not available before Mrs. Gabbard went into labor on April 25, 1978.
 
 
 4
 Because the patient's chart was unavailable at the time she was admitted to the hospital for labor pains, Mrs. Gabbard was not identified or treated as a high-risk patient. Before delivery she was given the drug Pitocin in order to augment her contractions. The dosage was increased in rapid increments. A caudal anesthetic was also administered, which inhibited her ability to push the fetus. The electronic fetal monitorings showed the baby to be in distress. Apparently nothing was done to alleviate the distress and the baby was delivered an hour and a half later by forceps. At birth Patrick exhibited poor color and respiratory distress. A pediatrician informed Mrs. Gabbard that the infant was having breathing problems due to oxygen deprivation, caused by the umbilical (nuchal) cord having been wrapped tightly around its neck at birth.
 
 
 5
 Although Patrick's condition had improved by the time he left the hospital, after nine months the Gabbards noticed that he seemed to be slow in developing and took him to see another Madigan pediatrician. This doctor performed some tests and concluded that Patrick suffered from cerebral palsy and hydrocephalus. She told the Gabbards that the tight nuchal cord had caused the cerebral palsy and brain damage by cutting off Patrick's oxygen supply. (Finding of Fact No. 44, ER 12). Over the next few years the Gabbards took Patrick to Madigan for treatment and were told numerous times by hospital physicians that the tight nuchal cord was the source of his problems. (Finding of Fact No. 43, ER 12).
 
 
 6
 John Gabbard left the Army in September 1982. In the course of conversations with his new civilian boss he became suspicious about the explanations he had received concerning Patrick's delivery and subsequently he and his wife contacted an attorney and sought from the government Patrick's medical records. After some delay the records were released to the Gabbards in early 1984. As a result of reviewing the records, the Gabbards became aware for the first time that the nuchal cord explanation was a fiction and that the real cause of Patrick's injuries was the combined action of the Pitocin, the caudal anesthetic, and the forceps delivery. (Findings of Fact Nos. 10, 11, 14, 15, 16, 19, 20, 26, 28, ER 8-10). The Gabbards then filed an administrative claim followed in due course by this complaint filed in district court on July 1, 1985.
 
 
 7
 In the Pretrial Order the government formally admitted negligence but moved to dismiss the case on the ground that the Gabbard's suit was barred by the Federal Tort Claims Act's statute of limitations. The district court denied the government's motion and the case went to trial. After reviewing the largely undisputed facts in the case, the court found that the nuchal cord wrapped tightly around Patrick's neck was not the cause of his injuries. Instead the court concluded that government doctors and staff were negligent in the treatment and care of Debra Gabbard during Patrick's delivery and that their negligence was the proximate cause of the baby's injuries. (Conclusion of Law No. 2, ER 16). The court also held that the Gabbard's claim was not barred by the FTCA's statute of limitations because the plaintiffs were not aware of the true cause of Patrick's injuries until they received his medical records in January and February, 1984.
 
 
 8
 The first question is whether the district court erred in holding the claim not barred by the FTCA's two-year statute of limitations. The second is whether any portion of the district court's damage award is unsupportable under the rule of Shaw v. United States, 741 F.2d 1202 (9th Cir.1984). As set forth below, we hold that the district court's factual findings with regard to neither issue were clearly erroneous, and the law was correctly applied.
 
 
 9
 As we stated in Colleen v. United States, 843 F.2d 329, 331 (9th Cir.1987), the date a plaintiff first discovers the existence and cause of an injury is a question of fact reviewed under the clearly erroneous standard. The date a plaintiff reasonably should have discovered the existence and cause of an injury is a mixed question of law and fact, also reviewed under the clearly erroneous standard. Id.
 
 
 10
 A damage award in a FTCA case is also reviewed for clear error. The district court's determination will be upheld unless upon examination this court is left "with the definite and firm conviction that a mistake has been committed." Trevino v. United States, 804 F.2d 1512, 1515 (9th Cir.1986), cert. denied, 484 U.S. 816, 108 S.Ct. 70 (1987), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 STATUTE-OF-LIMITATIONS CLAIM
 
 11
 Following the Supreme Court's decision in United States v. Kubrick, 444 U.S. 111 (1979), this court has held that "[a] medical malpractice claim does not accrue under the FTCA until the plaintiff discovers, or reasonably should have discovered, his injury and its causes." Colleen v. United States, 843 F.2d at 331. See Landreth v. United States, 850 F.2d 532, 533 (9th Cir.1988), cert. denied, 109 S.Ct. 866 (1989); When these "critical facts"--injury and cause--are known, the claim accrues, even if the plaintiff is unaware at the time that the injury may have been negligently inflicted. See Kubrick, 444 U.S. at 122.
 
 
 12
 The government claims that plaintiffs were in possession of these critical facts within nine months after Patrick's birth. The brief argues that the pediatrician the Gabbards consulted nine months after Patrick's birth told them explicitly, as had Madigan physicians after the delivery, that Patrick's condition resulted from oxygen deprivation. Under this view those statements were enough to put the Gabbards on notice of both the fact and immediate cause of Patrick's injuries, thereby putting on the parents the duty to ascertain the existence and source of fault within the statutory period. See Davis v. United States, 642 F.2d 328, 331 (9th Cir.1981), cert. denied, 455 U.S. 919 (1982). Appellant contends that once the Gabbards became aware of the "general cause" of the injury--oxygen deprivation--they were under a duty to investigate further and their failure to do so bars the malpractice claim under the FTCA in the absence of any showing of fraudulent concealment or misrepresentation.
 
 
 13
 Contrary to the government's claims, the district court found that, while the Gabbards knew of Patrick's injuries within nine months after his birth, they were unaware of the cause of his injuries until the medical records were obtained in 1984. (Finding of Fact No. 51, ER 13). If the Gabbards were unaware of the real cause of Patrick's injury, appellant's statute-of-limitations defense turns on whether plaintiffs exercised reasonable diligence in discovering the cause of the injury. Sanborn v. United States, ( In re Swine Flu Products Liability Litigation), 764 F.2d 637, 640 (9th Cir.1985). The district judge determined that the Gabbards' ignorance with regard to this second critical fact was occasioned, not by any lack of diligence in following up on the oxygen deprivation explanation, but rather by their reasonable reliance on the second part of the explanation given to them by Madigan personnel, i.e., that the oxygen deprivation resulted from the tight nuchal cord wrapped around Patrick's neck at birth. (Findings of Fact Nos. 48, 49, ER 12-13).
 
 
 14
 In Swine Flu we accepted the suggestion of other circuit decisions that " 'where a claimant is given a credible explanation of his condition not pointing to malpractice, he may not be found to have failed to exercise reasonable diligence because he did not earlier pursue his claim.' " In re Swine Flu, 764 F.2d at 641, quoting Exnicious v. United States, 563 F.2d 418, 424 (10th Cir.1977). See also Rosales v. United States, 824 F.2d 799 (9th Cir.1987); Raddatz v. United States, 750 F.2d 791, 796 (9th Cir.1984) (patient may reasonably rely on doctor's assurances that symptoms are normal consequence of condition not requiring treatment, such that the statute of limitations did not accrue until a later date, when patient discovered the symptoms to be the result of an infection). Two different doctors, one of whom was called by the government and employed by Madigan, testified that the nuchal cord explanation was one which would appear credible to a lay person. (RT Vol. III 33; RT Vol. IV 239). That explanation was given to the Gabbards shortly after Patrick's birth and repeatedly over the next few years in the course of Patrick's treatments at Madigan.
 
 
 15
 We agree with the district court's finding that the Gabbards did not fail to exercise reasonable diligence in ferreting out the true cause of Patrick's injuries; they relied upon credible explanations given to them by Madigan personnel until their suspicions were aroused by Mr. Gabbard's conversations with his boss.
 
 
 16
 Appellant argues that our decision in Herrera-Diaz v. United States, 845 F.2d 1534 (9th Cir.), cert. denied, 109 S.Ct. 306 (1988), controls this case. Appellant's Brief at 17-19. In Herrera, a baby was born premature at a Navy hospital and immediately transferred to Children's Hospital in San Diego, suffering from what Navy personnel described as "breathing problems." The infant stayed in Children's Hospital for five months, during which time doctors told Mrs. Herrera-Diaz that her child was brain damaged. She assumed the brain damage was the result of the premature birth and did not ask for any explanations about the cause of the baby's injury. When questioned later about her lack of inquiry, she replied: " 'I guess I really didn't want to know.' " Id. at 1536. Shortly thereafter she was told that her son had cerebral palsy, a condition which often occurred in premature babies and was caused by a lack of oxygen to the brain during delivery. Id. Mrs. Herrera-Diaz made no inquiries about the cause of the oxygen deprivation because she assumed the baby was " 'just born like that because that's the way God wanted it.' " Id.
 
 
 17
 Six years later, Mrs. Herrera-Diaz was contacted by attorneys who convinced her that she might have a claim against the government on behalf of her son. We affirmed the district court's dismissal of Herrera-Diaz' suit on the ground that it was time-barrred under the FTCA. We noted that Mrs. Herrera-Diaz was told of the injury (brain damage) and its "general cause" (oxygen deprivation) within five months after her son's birth, yet she made no inquiries as to the reason for the oxygen deprivation and, by her own admission, did not really want any explanation.
 
 
 18
 The crucial finding of a failure to exercise reasonable diligence was also influenced by the fact that Mrs. Herrera-Diaz received no explanations for the oxygen deprivation at all, yet was not prompted to investigate. By contrast, the Gabbards repeatedly inquired about the nature and cause of Patrick's injury, and were given a plausible (though false) explanation which quelled further investigation on their part.
 
 
 19
 Our decision in Herrera was premised on the fact that "[t]here is no evidence of fraudulent concealment or misrepresentation in the record." Id. at 1538. In this case, however, the district judge determined that the nuchal cord explanation was a "medically unreasonable" explanation to give, a finding that could support an inference of misrepresentation. (Finding of Fact No. 39, ER 11).
 
 
 20
 We find no clear error in the district court's decision that the Gabbards' claim was not time-barred under the FTCA's statute of limitations. While Patrick's parents may have known about their son's injury within nine months after his birth, they lacked awareness of the second fact critical to triggering the statute of limitations period until 1984, when Patrick's medical records arrived and the fiction of the nuchal cord explanation they had relied upon was exposed.
 
 THE DAMAGES CLAIM
 
 21
 Even if we reject the argument that the Gabbards' claim was time-barred under the FTCA, appellant argues that we should reverse that part of the district court's decision decreeing the amount of damages assessed against the government. Appellant argues that the court failed to fulfill the requirements set forth in Shaw, for calculation of pecuniary damages in FTCA claims. In that case we held that the district court judge must (1) clearly indicate his choice among three approved methods of discounting the award to present value and (2) explain his estimates of future inflation and interest rates. Shaw, 741 F.2d at 1207.
 
 
 22
 Nothing in Shaw or subsequent cases precludes a district judge from fulfilling those requirements by incorporating the economic analysis of an expert into his decision. In this case Judge Tanner explicitly adopted the analysis of the plaintiffs' economic expert, Dr. David M. Nelson, after concluding that Dr. Nelson's methods complied with the mandate of Shaw. (Finding of Fact No. 63, ER 16). The record indicates that the court computed the value of the plaintiffs' loss according to Washington law (Findings of Fact Nos. 60, 62, ER 15), accounted for the effects of income taxes (Findings of Fact Nos. 61, 64, ER 15-16), and discounted the total award to present value (Findings of Fact 60, 62, ER 15). See Shaw, 741 F.2d at 1205. Upon reviewing the evidence on the damages issue, we are without "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 23
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3