967 F.2d 586
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Bruce GORDON; Brenda J. Gordon-Brantley, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 91-36121.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 2, 1992.
Decided June 25, 1992.
As Amended on Denial of Rehearing Oct. 5, 1992.
 
 Before EUGENE A. WRIGHT, CANBY and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The United States appeals all but $95,000.00 of the district court's award of $8,259,023.00 plus costs to appellees, Bruce Gordon, Jr. [Gordon], his mother, Brenda Brantley, and his father, Bruce Gordon, Sr., under the Federal Tort Claims Act [FTCA]. 28 U.S.C. § 1346(b), 2671-2680. The district court granted the award for medical malpractice by a doctor at Sheppard Air Force Base, Wichita Falls, Texas, who delivered Bruce Gordon, Jr. on June 25, 1984.
 
 
 3
 This court has jurisdiction pursuant to 28 U.S.C. section 1291. We reverse on the ground that the claim is time-barred under the statute of limitations.
 
 FACTS
 
 4
 Brenda Gordon [now Brenda Gordon Brantley] arrived at the obstetrics/gynecology clinic at the United States Air Force Hospital, Sheppard Air Force Base, Wichita Falls, Texas at 9:40 a.m. on June 25, 1984. She was married to an active duty serviceman and was more than eight months pregnant. Her amniotic membrane had spontaneously ruptured before her admission. A nurse-practitioner examined her and determined that she was in labor. Mrs. Brantley said that she had not felt fetal movement since the previous morning.
 
 
 5
 The obstetrician/gynecologist on call, Major Jyh-Chwen Liang, M.D., examined her at 10 a.m. Liang determined that the pregnancy was full term, that the membrane had ruptured and that there was meconium in the amniotic fluid.[1] A fetal heart monitor indicated a normal heart rate but an abnormal beat-to-beat variability, which caused Dr. Liang to decide that a Caesarian section might be necessary.
 
 
 6
 Dr. Liang monitored the fetal heart rate until 11:30 a.m., during which time the condition remained unchanged. At 11:30, Dr. Liang determined that the fetus was in distress, and he decided to perform a Caesarian section. At 12:15, the procedure was begun. After making an incision, the doctor found the amniotic fluid heavily stained with meconium.
 
 
 7
 Bruce Gordon, Jr. was born at 12:40 p.m. Bruce Jr. had no heartbeat and he was not breathing. He received immediate medical attention and his condition improved. He was transferred to Wilford Hall Medical Center, where he was treated for meconium aspiration syndrome and pulmonary hypertension. He developed seizures five days later and was treated with phenobarbital. He was discharged on July 14. He was diagnosed as having suffered from birth asphyxia and persistent fetal circulation.
 
 
 8
 Bruce Jr.'s family moved soon thereafter to Washington state. Bruce Jr. was examined at Madigan Army Medical Center and referred to developmental pediatrics because his head growth was abnormal. The doctor in developmental pediatrics, Dr. Onufer, told Mrs. Brantley that he thought Bruce Jr. was developmentally delayed, was showing slow head growth and might have a seizure disorder because of fetal distress at birth. He referred Gordon to Mary Bridge Children's Hospital in Tacoma, Washington, where Gordon received physical therapy.
 
 
 9
 In late 1984, Dr. Onufer ordered a CAT scan, which revealed severe brain abnormalities. Doctors told Mrs. Brantley that Bruce Jr. was likely to be severely retarded. Bruce, Jr. is now seven, and he has physical and mental impairments. He has a form of cerebral palsy, mental retardation and microcephaly.
 
 
 10
 Appellees filed an administrative claim for medical malpractice with the Air Force on October 3, 1988. On November 25, 1989, the claim was dismissed as time barred under the two-year statute of limitations in the Federal Tort Claims Act. Appellees brought this action in the United States District Court for the Western District of Washington.
 
 STATUTE OF LIMITATIONS
 
 11
 The Federal Torts Claim Act authorizes lawsuits against the United States government by a person whose injuries were proximately caused by a government employee's negligence. We review for clear error the district court's factual determinations. Shaw v. United States, 741 F.2d 1202, 1205 (9th Cir.1984). Here, the court concluded that Mrs. Brantley and Bruce Sr. could not have known the cause of their son's injuries within two years of his birth. This finding is clearly erroneous.
 
 
 12
 The FTCA provides that a tort claim against the federal government must be brought "within two years after such claim accrues." 28 U.S.C. § 2410(b). In medical malpractice actions under the FTCA, however, a claim does not accrue, and the limitation period does not begin to run, until a plaintiff discovers both the injury and its cause. United States v. Kubrick, 444 U.S. 111 (1979). When both the injury and its cause are known, the claim accrues even though the plaintiff is not aware that the injury may have been negligently inflicted. Id. at 123-24.
 
 
 13
 Relying on Kubrick, we developed an objective standard to determine when a medical malpractice action accrues under the FTCA. The claim accrues when a " 'plaintiff has discovered, or in the exercise of reasonable diligence should have discovered both his injury and its cause.' " Herrera-Diaz v. Dept. of Navy, 845 F.2d 1534, 1537 (9th Cir.1988) (quoting Davis v. United States, 642 F.2d 328, 331 (9th Cir.1981), cert. denied, 455 U.S. 919 (1982)).
 
 
 14
 We applied this standard in Fernandez v. United States, 673 F.2d 269 (9th Cir.1982). In Fernandez, we determined that parents of a child who developed jaundice shortly after his birth in 1958, "knew [by 1964], or had available the means of knowing, all there was to know about the cause of his injuries, and who (the nurses and the doctors who diagnosed and treated his jaundice) were responsible." Id. at 271. We said that had the parents inquired at that time, they presumably would have learned of the possibility that their son had received treatment too late. His parents brought suit in 1976. We held that the statutory period barred the child's claim.
 
 
 15
 Also in Herrera-Diaz, 845 F.2d at 1537, we held that the limitation period barred a mother's negligence action against the government for her child's brain damage. In 1978, the mother learned that her son suffered from cerebral palsy caused by lack of oxygen to the brain at birth. She did not bring suit until 1984. We found that a reasonable person would have made some kind of inquiry, and that it was her burden, within the statutory period, to determine whether and whom to sue. Id. at 1537.
 
 
 16
 Here, as in Fernandez and Herrera-Diaz, the appellees were aware of Bruce Jr.'s injury and its cause more than two years before they filed suit. Shortly after Bruce Jr.'s birth, Mrs. Brantley knew that he had breathing problems caused by meconium aspiration. When he was three months old, doctors told her they were concerned by his slow head growth. By late 1984, she knew that he was developmentally delayed and that the cause was stress at birth. At that time she knew, or in the exercise of reasonable diligence should have discovered, both Bruce Jr.'s injury and its cause. See Davis, 642 F.2d at 331. The two year statute of limitation began to run at that time.
 
 
 17
 Bruce Jr.'s medical negligence claim accrued in 1984, and the district court should have dismissed this claim as time barred under 28 U.S.C. § 2401(b).
 
 
 18
 Except for the award of $95,000.00 to Bruce's father, not contested by the government, the judgment of the district court is reversed.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Meconium is fetal waste from the intestinal tract, which is usually not released prior to birth; thus, it is unusual for it to be in the amniotic fluid